| | |
|---|---|
| **UNITED STATES OF AMERICA ex rel. PAUL TAHLOR, M.D., AND MARGARET MARINO, R.N.,**<br><br>        **Plaintiffs,**<br><br>   **v.**<br><br>**AHS HOSPITAL CORPORATION, ATLANTIC HEALTH SYSTEMS, INC., SUMMIT MEDICAL GROUP, EMERGENCY MEDICAL ASSOCIATES OF NEW JERSEY, HOSPITALIST ASSOCIATES, INC., DAVID SCHRECK, M.D., AND SAMIR PATEL, M.D.,**<br><br>        **Defendant.** | Civ. No. 2:08-cv-02042 (WJM)<br><br><br>**OPINION** |

       This is a *qui tam* case brought under the False Claims Act. Whistleblowers Dr. Paul Tahlor and nurse Margaret Marino (together "Relators") allege that a host of hospitals, physicians, and physician practice groups improperly billed Medicare for inpatient admissions. Relators also claim they were retaliated against after they brought the instant lawsuit. Defendants Hospitalist Associates, Inc., Summit Medical Group, Emergency Medical Associates of New Jersey, Dr. David Schreck, Dr. Samir Patel (together "the non-AHS Defendants"), as well as Atlantic Health System, Inc. and AHS Hospital Corporation (together "AHS"), move to dismiss Relators' First Amended Complaint ("FAC") pursuant to Federal Rule of Civil Procedure 12(b)(1), on jurisdictional grounds, and pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6), on merits grounds. Relators oppose the motions. In the alternative, Relators maintain that any defects in the FAC are cured in a proposed Second Amended Complaint ("SAC"), which they move to file pursuant to Federal Rule of Civil Procedure 15(a)(2). For the reasons set forth below, Defendants' Rule 12(b)(1) motions to dismiss are **GRANTED**, Defendants' Rule 9(b) and 12(b)(6) motions to dismiss are **GRANTED IN PART**, and **DENIED IN PART**, and Relators' Rule 15(a) motion to amend is **DENIED**.

# I.    FACTUAL AND PROCEDURAL BACKGROUND

## A.    The Parties

Defendant Atlantic Health System, Inc. is the parent of Defendant AHS Hospital Corporation.  The Court refers to Atlantic Health System, Inc. and AHS Hospital Corporation jointly as "AHS."  AHS operates OMC (formerly known as Overlook Hospital), and MMC (formerly known as Morristown Memorial Hospital).  First Am. Compl. ("FAC") ¶ 16.  Before June 1, 2007, AHS also owned Mountainside Hospital ("Mountainside").  *Id.*

Defendant Hospitalist Associates, Inc. ("HA") is a private physician group headed by Defendant Dr. Samir Patel.  *Id.* ¶ 27.  HA doctors practice at OMC.  *Id.*  Defendant Summit Medical Group ("SMG") is a private physician group that provides care at OMC, MMC, and Mountainside.  *Id.* ¶ 25.  Defendant Emergency Medical Associates of New Jersey ("EMA") is a private physician group that provides emergency medical services at OMC and MMC.  *Id.* ¶ 26.  Defendant Dr. David Schreck directs SMG's outpatient clinic.  *Id.* ¶ 25.  At "some times relevant to th[e] complaint," Dr. Schreck was the head of EMA.  *Id* ¶ 26.

Relator Dr. Paul Tahlor worked at OMC as a physician advisor from 2006 until September 2008.  *Id.* ¶ 14.  At OMC, Tahlor reviewed Medicare bills to determine whether care that was provided was "justified based on a physician review and objective criteria."  *Id.*  Relator Margaret Marino worked at OMC as a Nurse Case Manager and Same Day Surgery Case Manager from October 2005 until September 2008.  *Id.* ¶ 15.  At OMC, Marino was "at the front of the line in trying to get AHS and its medical staff, including physicians from SMG, EMA, and HA, to be aware of [the Center for Medicare and Medicaid Services' ("CMS's")] rules, regulations, and policies concerning proper level of care designations."  *Id.* ¶ 15.

## B.    Medicare

The Medicare Statute, 42 U.S.C. §§ 1395 to 1395kkk-1, provides for different types of benefits.  Medicare Part A covers inpatient hospital care, 42 U.S.C. §§ 1395c to 1395i-5.  It also provides for post-hospital extended care at a skilled nursing facility ("SNF") in cases where patients spend three consecutive days in inpatient care.  42 C.F.R. § 409.30(a).  Medicare Part B covers certain outpatient services, 42 U.S.C. §§ 1395j to 1395w5.  This includes observation services, "a well-defined set of specific, clinically appropriate services . . . that are furnished while a decision is being made regarding whether patients will require further treatment as hospital inpatients or if they are able to be discharged from the hospital."  Medicare Claims Processing Manual (CMS Pub. 100–4), ch. 4, § 290.1. "Observation services are commonly ordered for patients who present to the emergency department and who then require a significant period of treatment or monitoring in order to make a decision concerning their admission or discharge."  *Id.*  "In only rare and exceptional cases do reasonable and necessary

outpatient observation services span more than 48 hours." *Id.* Medicare will only pay for services that are "reasonable" and "[medically] necessary." 42 U.S.C. § 1395y.

## C. Defendants' Billing Practices

At the heart of this case is the allegation Defendants chose to bill Medicare for more expensive inpatient services when they should have billed for less expensive observation services.

When he worked at AHS, Tahlor sat on a compliance committee whose notes "broadly reflected the failure of medical staff, including physicians associated with SMG, EMA, and HA, to properly comply with observation service rules, regulations and policies." *Id.* ¶ 14. During her time at OMC, Marino would try to tell Dr. Schreck, Dr. Patel, and doctors from SMG, EMA, and HA about CMS's billing rules and regulations governing when patients should be placed on observation status rather than on inpatient status, but she was "openly and aggressively rebuffed." *Id.* ¶ 15. In 2006, a case manager at MMC told Marino that MMC was not placing patients on observation status, and was instead admitting all patients as inpatients. *Id.* ¶ 23.

In 2003-2005, OMC's observation status admission rate was lower than the national average. *Id.* ¶ 155. In 2006, the same rate was slightly lower than the national average, and in 2007-2009 the rate was the same as the national average or slightly higher than the national average. *Id.* ¶ 156. At MMC, the rates of observation billing were lower than the national averages in 2003 to 2009. *Id.* ¶ 155.

Relators claim that SMG doctors "regularly misclassified patients for Inpatient services . . . and Observation services at OMC, MMC, and Mountainside, as well as provided medical treatment and services that were not medically necessary at these respective levels of care." *Id.* ¶ 25. Relators make similar allegations about EMA and HA, Dr. Schreck, Dr. Patel. *Id.* ¶¶ 26, 27, 28. With respect to Dr. Schreck and Dr. Patel, Relators claim that Dr. Schreck "knowingly and overtly refused to follow CMS rules, regulations and policies regarding levels of care and settings for care." *Id.* ¶ 29. Dr. Schreck said that "he did not have to comply with CMS's rules, regulations, and policies regarding the proper designation of patients to Observation status for Medicare billing purposes." *Id.* Dr. Patel made similar claims. *Id.*

Relators further claim that OMC, MMC, and Mountainside patients would be kept on inpatient status for three days just so that Medicare would pay for extended care services at a skilled nursing facility, or "SNF." *Id.* ¶ 32. Based on a common corporate governance structure and management structure at OMC, MMC, and Mountainside, based on reports they read and conversations they had, and based on statistical data, Relators maintain that OMC, MMC, and Mountainside had "the same or similar practices with respect to billing, or causing others to bill Medicare for Inpatient services, [and] Observation services." *Id.* ¶ 23.

In the First Amended Complaint, which the Court also refers to as the "FAC," Relators identify 90 patients whose status was changed by OMC from inpatient to observation status in 2006-2008. *Id.* ¶ 90. Dr. Schreck and Dr. Patel were responsible

for some of the original inpatient designations. *Id.* Upon information and belief, Relators allege that the attending physicians who admitted these 90 patients continued to bill Medicare for inpatient admissions, even after OMC changed the patients' designations for purposes of its bills to Medicare. *Id.* ¶ 160.

The FAC also describes nine examples of what Relators refer to as "improper admissions at OMC." *Id.* at 68. One example involved a skilled nursing facility, or SNF, that provided false information to OMC in order to get a patient admitted on an inpatient basis. *Id.* ¶ 161. In four examples, OMC recognized that inpatient admissions were improper, and OMC changed patients' status to outpatient (though in one case it appears that a patient was able to used the incorrect inpatient designation get Medicare to pay for a stay at an SNF). *Id.* ¶¶ 162, 164, 167, 168. In another example, Dr. Schreck, admitted a patient as an inpatient even though, according to Relators, labs and x-ray findings did not support an inpatient admission. *Id.* ¶ 163. Dr. Schreck ordered antibiotics, even though infection was never ruled in, and he kept the patient in the hospital for three days "solely to meet the financial needs of the patient's family who were looking from the outset . . . for long term care placement. *Id.* ¶ 163. In another example, a patient with a urinary tract infection was admitted as an inpatient, and in another example a 95 year old patient was admitted based solely on back pain. *Id.* ¶¶ 165, 169. In a final example, a doctor changed an inpatient admission to an observation status admission at the request of a physician advisor, but the next day the doctor changed the status back to inpatient, and he "may have ordered a blood transfusion unnecessarily." *Id.* ¶ 166. It was the doctor's goal to transfer the patient to an SNF, but the transfer was never made. *Id.*

Furthermore, the FAC identifies various SNFs that were "involved in various types of Medicare billing fraud in connection with OMC patients." *Id.* ¶ 153.

### D. The Original Complaint

Relators filed their sealed qui tam complaint (the "Complaint") on April 25, 2008. ECF No. 1. The sealed Complaint named as Defendants AHS, OMC, SMA, EMA, HA, Dr. Schreck, Dr. Patel, and others. Counts I and II of the Complaint asserted False Claims Act ("FCA") claims based on six schemes (the "Six Schemes") at OMC:

Scheme 1: Billing Medicare for inpatient hospital services for patients who did not meet medical necessity criteria for inpatient admission. Compl. ¶ 3(a).

Scheme 2: Billing Medicare for outpatient "observation services" or "treatment room services" for patients who did not meet medical necessity criteria for such care. *Id.* ¶ 3(b).

Scheme 3: Failing to correct claims for inpatient and observation admissions. *Id.* ¶ 3(c).

Scheme 4:     Failing to inform physicians and patients when OMC changed patient status from inpatient to outpatient. *Id.* ¶ 3(d).

Scheme 5:     Billing for inpatient hospital services for patients whose inpatient stays extended longer than was medically necessary. *Id.* ¶ 3(e).

Scheme 6:     Improperly keeping patients on the inpatient service for three days just so that Medicare would pay for those patients to be admitted to SNFs. *Id.* ¶ 3(f).

Count III alleged conspiracy under the FCA.

### E.     The Administrative Order

On May 19, 2008, the Court entered a sealed order (the "Administrative Order"). ECF No. 6. The Administrative Order stayed the case and "administratively terminate[d] this action . . . without prejudice to the right of any party . . . to administratively reopen these proceedings at any time, for any reason, on written notice to the Court." *Id.* The Administrative Order also provided that if the case were reopened, "the rights of the Relators and the United States . . . are hereby fully preserved as they exist at the time of entry of this Order, including, but not limited to, Relators' rights under . . . [31 U.S.C.] § 3730(e) (the FCA's "Public Disclosure Bar"), and § 3731(b) (the FCA's statute of limitations)." *Id.*

### F.     Relators Leave AHS

In September 2008, some two years after Tahlor began working for AHS, and months after the original Complaint was filed, AHS refused to renew Tahlor's contract. FAC ¶ 14. Tahlor maintains that he was retaliated against for bringing this lawsuit. *Id.* ¶ 7. Marino began working at AHS in October 2005. *Id.* ¶ 15. AHS terminated Marino in September 2008. *Id.* Marino also maintains that she was retaliated against for bringing this lawsuit. *Id.* ¶ 7.

### G.     Audits of MMC and OMC

On September 24, 2010, while this case remained sealed, a recovery audit contractor called Performant Recovery, Inc. (the "RAC") began auditing MMC's inpatient admissions of Medicare patients. Amspacher Declaration ¶ 6, ECF No. 52-4. Four months later, the RAC began to audit OMC's inpatient admissions. Karaman-Meacham Declaration ¶ 6, ECF No. 52-6.

The audits, which continue to this day, begin with a letter identifying medical records the RAC wants to review. Amspacher Declaration ¶ 7; Karaman-Meacham

Declaration ¶ 7. If the RAC identifies improper inpatient admissions, it demands reimbursement. Amspacher Declaration ¶ 12; Karaman-Meacham Declaration ¶ 11.
RAC findings are reviewed by staff members who are responsible for the initial decision to bill Medicare for inpatient services. Amspacher Declaration ¶ 14; Karaman-Meacham Declaration ¶ 13. The results of the RAC audits are posted on a shared drive accessible by AHS's corporate office. Amspacher Declaration ¶ 15; Karaman-Meacham Declaration ¶ 14. To date, the RAC has audited more than 1,500 medical records from MMC and over 700 medical records from OMC. Ampspacher Decl. ¶ 11, Karaman Decl. ¶ 10.

### H. Partial Settlement

On June 18, 2012, the United States intervened in the case for purposes of partially settling Scheme 1 FCA claims brought against AHS based on conduct at OMC. Importantly for purposes of this case, the settlement (the "Settlement") was restricted to improper inpatient billing from January 1, 2002 until July 31, 2009 (the "Covered Conduct"). The settlement (the Settlement) expressly did not release claims based on conduct other than the Covered Conduct. Settlement ¶ 5(d), Ex. 1 to Joint Stipulation of Partial Dismissal of Relators' Complaint ("Joint Stipulation"); ECF No. 11 at 4-5. The Settlement was valued at roughly $9 million dollars. After the Settlement, the United States decided that it would no longer intervene in the case.

### I. The First Amended Complaint (the "FAC")

"Months before" November 7, 2012, Relators presented their case against MMC and Mountainside to attorneys from the Department of Justice. McInnis Cert. ¶ 3. On November 7, 2012, Relators moved to file the FAC. ECF No. 36. On March 5, 2013, the Honorable Mark Falk granted the motion. ECF No. 59. Like the original Complaint, Counts I and II of the FAC allege FCA violations at OMC based on conduct described in Schemes 1-6. The FAC also alleges that the conduct described in Schemes 1-3 and 5-6 of the original Complaint was also occurring at two additional AHS hospitals, MMC and Mountainside. Finally, Scheme 4 of the FAC alleges that MMC and Mountainside did not change improper inpatient admissions to observation admissions, or did so "inadequately."
Count III of the FAC alleges conspiracy under the FCA, and Count IV of the FAC alleges wrongful retention under the FCA. Finally, Counts V-VIII of the FAC allege retaliation against Tahlor and Marino, in violation of the FCA and New Jersey's Conscientious Employee Protection Act ("CEPA").

## II.    LEGAL STANDARDS

### A.    Rule 15(a)(2)

Federal Rule of Civil Procedure 15(a)(2) allows plaintiffs to amend their pleading with the Court's permission.  Courts should "freely give leave when justice requires." *Id.*

### B.    Rule 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) provides for the dismissal of a complaint for lack of subject matter jurisdiction.  Fed. R. Civ. P. 12(b)(1).  There are two types of challenges to subject-matter jurisdiction: (1) facial attacks, which challenge the allegations of the complaint on their face; and (2) factual attacks, which challenge the existence of subject-matter jurisdiction, quite apart from any pleadings.  *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977).  In reviewing a factual attack, like the one in this case, the court may consider evidence outside the pleadings, and no presumptive truthfulness attaches to the plaintiff's allegations.  *Gould Electronics Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000); *Gotha v. United States*, 115 F.3d 176, 178-79 (3d Cir. 1997).  The plaintiff bears the burden of proving that jurisdiction exists.  *Gould Electronics*, 220 F.3d at 178.

### C.    Rule 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a complaint, in whole or in part, if the plaintiff fails to state a claim upon which relief can be granted. The moving party bears the burden of showing that no claim has been stated. *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005).  In deciding a motion to dismiss under Rule 12(b)(6), a court must take all allegations in the complaint as true and view them in the light most favorable to the plaintiff.  *See Warth v. Seldin*, 422 U.S. 490, 501 (1975); *Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts Inc.*, 140 F.3d 478, 483 (3d Cir. 1998).

Although a complaint need not contain detailed factual allegations, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  To comply with Federal Rule of Civil Procedure 8(a), factual allegations must be sufficient to raise a plaintiff's right to relief above a speculative level, such that it is "plausible on its face."  *See id.* at 570; *see also Umland v. PLANCO Fin. Serv., Inc.*, 542 F.3d 59, 64 (3d Cir. 2008).  A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). While "[t]he plausibility standard is not akin to a 'probability requirement' . . . it asks for more than a sheer possibility." *Iqbal*, 556 U.S. at 1949.

**D.     Rule 9(b)**

Federal Rule of Civil Procedure 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Relators can satisfy the requirements of Rule 9(b) by pleading the "the date, place or time' of the fraud, or through 'alternative means of injecting precision and some measure of substantiation into their allegations of fraud." *Lum v. Bank of Am.*, 361 F.3d 217, 224 (3d Cir. 2004) (internal citation and quotation omitted).

**III.     DISCUSSION**

Defendants move to dismiss the FAC on jurisdictional and merits grounds. Relators oppose the motion. In the alternative, Relators maintain that if the motion is granted, Relators should be permitted to file a Second Amended Complaint, or "SAC." Relators attach a proposed SAC to their opposition brief. Defendants argue that the SAC fails to cure the defects in the FAC. Accordingly, Defendant argue that leave to file the SAC should be denied on futility grounds. The Court begins with Defendants' motions to dismiss and then turns to Relators' motion to amend.

**A.     Defendants' Motions To Dismiss The First Amended Complaint**

Count I is an FCA claim for submission of false and fraudulent claims under 31 U.S.C. § 3729(a)(1). Count II is an FCA claim for making, using, and causing to be made and used, false records and statements under 31 U.S.C. § 3729(a)(2). Count III is an FCA claim for conspiracy under 31 U.S.C. § 3729(a)(3). Count IV is an FCA claim for wrongful retention under 31 U.S.C. § 3729(a)(1)(G). Counts V and VI, respectively, allege retaliation against Tahlor under CEPA and the FCA. Counts VII and VIII, respectively, allege retaliation against Marino under CEPA and the FCA. Defendants move to dismiss all counts.

**1.     Counts I and II**

Counts I and II are FCA claims based on improper billing at OMC, MMC, and Mountainside. Defendants move to dismiss Counts I and II on both jurisdictional and merits grounds.

**a.     Rule 12(b)(1) Motions to Dismiss**

Relators bear the burden of persuasion when it comes to establishing subject matter jurisdiction. *Atkinson*, 473 F.3d at 509, n.4. Relators have failed to satisfy their burden. Pursuant to a jurisdictional limitation called the "Public Disclosure Bar," the

Court will dismiss two sets of claims against all Defendants: (1) with respect to MMC: Scheme 1 claims and Scheme 3 claims based on inpatient billing; and (2) with respect to OMC: Scheme 1 claims based on post-July 31, 2009 conduct.

> i. Scheme 1 and Certain Scheme 3 Claims Against AHS Based on Conduct at MMC

AHS argues that the Public Disclosure Bar, 31 U.S.C. § 3730(e)(4)(A), divests the Court of jurisdiction over certain Scheme 1 claims based on conduct at MMC. The Public Disclosure Bar was amended on March 23, 2010, two years after this case was filed. Relators maintain that the Court should apply the pre-March 23, 2010 version of the Public Disclosure Bar to pre-March 23, 2010 conduct at MMC, and Relators further maintain that the Court should apply the current version of the Public Disclosure Bar to the more recent conduct. Regardless of which version of the Public Disclosure Bar applies, the outcome is the same: Relators have not satisfied their burden to establish jurisdiction. Accordingly, the Court will **DISMISS WITH PREJUDICE** the Scheme 1 claims and certain Scheme 3 Claims (namely, the Scheme 3 claims concerning inpatient admissions) against AHS based on conduct at MMC.

> a. The Public Disclosure Bar Before March 23, 2010

When this case was filed in 2008, the FCA's Public Disclosure Bar divested courts of subject matter jurisdiction where:

> (1) there was a "public disclosure"; (2) "in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government [General] Accounting Office report, hearing, audit, or investigation, or from the news media"; (3) of "allegations or transactions" of the fraud; (4) that the relator's action was "based upon"; and (5) the relator was not an "original source" of the information.

*U.S. ex rel. Paranich v. Sorgnard*, 396 F.3d 326, 332 (3d Cir. 2005). The term "original source" was defined as "an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information." *Id.* (citing 31 U.S.C. § 3730(e)(4)(B)). As Relators focus on the first, fourth, and fifth prongs, the Court will similarly restrict its analysis.

The Third Circuit has "suggested" that the first prong of the test "requires information to be public enough that it 'would have been equally available to strangers to the fraud transaction had they chosen to look for it as it was to the relator.'" *Sorgnard*, 396 F.3d at 333 (quoting *United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. The Prudential Ins. Co.*, 944 F.2d 1149, 1155-56 (3d Cir. 1991)). But it has also

recognized that "[w]hether a disclosure is 'public' is a determination influenced significantly by the specific source or context of the disclosure and the particular facts of each case." *Id.* Releasing information to a single freedom of information act ("FOIA") requester qualifies as a public disclosure. *United States ex rel. Mistick PBT v. Hous. Auth.*, 186 F.3d 376, 383 (3d Cir. 1999); *see also id.* at 383 n.3 ("public disclosure" is not the same as "public accessibility"). A public disclosure also occurs when a government agency sends a letter informing a doctor that he is being investigated for fraud. *See Glaser v. Wound Care Consultants*, 570 F.3d 907, 913-14 (7th Cir. 2009). With respect to the fourth prong of the test, a claim is "based upon" a public disclosure when the claim is "supported by" or "substantially similar to" a public disclosure. *Sorgnard*, 396 F.3d at 335. A claim can be "based upon" a public disclosure even if it is not "actually derived from" the public disclosure. *Id.* (internal quotation and citation omitted). Finally, a claim can be "based upon" a public disclosure if the public disclosure concerned similar conduct that occurred in a different time period. *See U.S. ex rel. Boothe v. Sun Healthcare Grp., Inc.*, 496 F.3d 1169, 1174 (10th Cir. 2007) (rejecting "the contention that a 'time, place, and manner' distinction is sufficient to escape the force of the public disclosure bar"). Finally, to qualify as an "original source" for purposes of the fifth prong, a relator must have "direct and independent knowledge" of the transactions that are the subject of his FCA claim. *U.S. ex rel. Atkinson v. PA. Shipbuilding Co.*, 473 F.3d 506, 520 (3d Cir. 2007). "'Independent knowledge' is knowledge that does not depend on public disclosures." *Id.* "'Direct knowledge' is knowledge obtained without any 'intervening agency, instrumentality or influence: immediate.'" *Id.* (quoting Webster's Third New International Dictionary 640 (1976)).

The Public Disclosure Bar divests the Court of jurisdiction over Scheme 1 and certain Scheme 3 claims (namely, those claims concerning inpatient admissions) based on conduct at MMC.

First, RAC's communications with MMC about RAC audits qualify as "public disclosures." *See U.S. ex rel. Kirk v. Schindler Elevator Corp.*, 601 F.3d 94, 104 (2d Cir. 2010) ("[O]nce innocent employees of a company being investigated for fraud [are] informed of the allegations, public disclosure of those allegations had occurred."). Relators argue that the RAC audits are not "public disclosures" because Relators make no allegation that MMC employees were "free to disseminate the audit information outside of AHS to the general public." Relators' Br. at 15, ECF No. 69. But Relators provide the Court with no authority for the proposition that a disclosure is not public for purposes of the Public Disclosure Bar when information is disclosed to someone who has nothing more than a business obligation to keep the information secret.

Second, to the extent they rest on the inpatient billing alleged at issue in Schemes 1 and Scheme 3, Counts I and II are "based upon" the transactions that are the subject of the RAC audits: Scheme 1 concerns improper billing for inpatient admissions at MMC. The Scheme 3 claims at issue concern the failure to refund money derived from improper inpatient admissions. The RAC audits are investigating whether MMC's inpatient admissions were medically necessary. Amspacher Declaration ¶ 6.

<u>Third</u>, Relators are not "original sources" because they do not have direct and independent knowledge about what happened at MMC. Relators did not work at MMC. While Relators maintain that they were "in the thick of the inpatient admission process and personally witnessed countless improper inpatient admissions," Relators' Br. at 20, Relators do not allege that they witnessed improper inpatient admissions at MMC. Indeed, Relators' knowledge of what happened at MMC appears to be second-hand. *See U.S. ex rel. Zizic v. Q2Administrators, LLC*, --- F.3d ----, 2013 WL 4504765, at *7 (3d Cir. Aug. 26, 2013) ("direct knowledge is based on 'first-hand' information") (internal citation omitted). Accordingly, the Public Disclosure Bar bars Counts I and II to the extent those counts are based on Scheme 1 and Scheme 3 conduct with respect to inpatient billing at MMC.

Relators' attempts to argue around this conclusion are unsuccessful. First, Relators argue that the FCA's "alternate remedy provision," 31 U.S.C. § 3730(c)(5) ("Section 3730"), trumps the Public Disclosure Bar and vests this Court with jurisdiction. But Section 3730 says nothing about the Public Disclosure Bar, or even about jurisdiction. Second, Relators argue that the Administrative Termination Order nullifies the Public Disclosure Bar. The Administrative Order provided that if the case were reopened, "the rights of the Relators and the United States . . . are hereby fully preserved as they exist at the time of entry of this Order, including, but not limited to, Relators' rights under [the Public Disclosure Bar, 31 U.S.C. § 3730(e)]." ECF No. 6. This means that public disclosures made after the entry of the Administrative Order would not divest the Court of jurisdiction over claims in the Complaint. The Administrative Order said nothing about claims against MMC—claims that were not included in the original Complaint.

b.      The Current Public Disclosure Bar

The current version of the Public Disclosure Bar was signed into law on March 23, 2010. Relators ask the Court to apply the current version of the Public Disclosure Bar to conduct that occurred at MMC after March 23, 2010. Even if the Court were to apply the current version of the Public Disclosure Bar to post-March 23, 2010 conduct at MMC, the Court would still dismiss Counts I and II to the extent those counts are based on Scheme 1 and Scheme 3 (inpatient admissions allegations only).

For the most part, the parties appear to agree that the analysis under the current Public Disclosure Bar is no different from the analysis required by the pre-March 23, 2010 version of the law. However, Relators maintain that the new definition of "original source" materially differs from the old definition. According to the current version of the Public Disclosure Bar, an "original source" is defined as:

an individual who either (i) prior to a public disclosure under subsection (e)(4)(a), has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or (2) who has knowledge that is independent of and materially adds to the publicly

disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section.

31 U.S.C. § 3730(e)(4)(B). Relators do not qualify as original sources under this definition. First, Relators did not voluntarily disclose information about MMC's inpatient billing practices until months before the partial settlement between AHS and the Government in June 2012—roughly two years after the RAC audits began. McInnis Cert. ¶ 3; Amspacher Declaration ¶ 6. Second, Relators make no claim that they provided the government with information that materially adds to the information the government already had.

ii.    Scheme 1 Claims Against AHS Based on Post-July 31, 2009 Conduct at OMC[1]

In their original Complaint, Relators brought FCA claims alleging that OMC improperly billed Medicare for inpatient admissions. Relators settled their claims for the time period beginning on January 1, 2002 and ending on July 31, 2009. *See* Settlement ¶ 2; *see also id.* ¶ 5(d) (release extends only to period from January 1, 2002 through July 31, 2009). In the FAC, Relators seek to impose FCA liability on AHS for Scheme 1 conduct at OMC beginning on July 31, 2009 (the "Post-July 31, 2009 OMC Claims"). Based on the Public Disclosure Bar, the Court will **DISMISS WITH PREJUDICE** the Scheme 1 claims against AHS based on post-July 31, 2009 conduct at OMC.

As in the previous section, the focus is on the first, fourth, and fifth prongs of the Public Disclosure Bar:

<u>First</u>, as established in the earlier section, the RAC audits of OMC constitute public disclosures.

<u>Second</u>, the Post-July 31, 2009 OMC claims are based on the same allegedly improper inpatient admissions that are the subject of an RAC audit. Karaman-Meacham Declaration ¶ 6.

<u>Third</u>, regardless of which Public Disclosure Bar applies, Relators are not "original sources" with respect to the Post-July 31, 2009 OMC Claims. Relators are not original sources under the pre-March 23, 2010 Public Disclosure Bar because they stopped working at AHS in 2008, and consequently lack direct and independent knowledge about what happened at OMC after 2008. Relators are not original sources under the current version of the Public Disclosure Bar because they did not voluntarily disclose information about post-July 31, 2009 conduct at OMC until after the RAC began auditing OMC. Furthermore, Relators make no showing that their knowledge of post-July 31, 2009 conduct at OMC materially adds to what has been discovered through the RAC audits.

---

[1] AHS makes additional arguments for why the Public Disclosure Bar and the Civil Suit Bar, 31 U.S.C. § 3730(e)(3), divest this Court of jurisdiction over the Post-July 31, 2009 OMC Claims. Based on the Court's conclusions, the Court need not address these arguments.

Relators might argue that they are original sources with respect to their Post-July 31, 2009 OMC Claims since Relators are the original sources of information about what happened at OMC when Relators were still employed by AHS. Even if Relators are correct about being original sources of information about what happened when they were employed by AHS, Relators' argument still fails. The Public Disclosure Bar is meant to "promote private citizen involvement in exposing fraud against the government, while at the same time prevent parasitic suits by opportunistic late-comers who add nothing to the exposure of the fraud." *Foundation For Fair Contracting, Ltd. v. G & M Eastern Contracting & Double E, LLC*, 259 F. Supp. 2d 329, 335 (D.N.J. 2003) (quoting *Costner v. URS Consultants, Inc.*, 153 F.3d 667, 675-76 (8th Cir. 1998)). The Post-July 31, 2009 OMC Claims "add nothing to the exposure of fraud" because the Settlement between AHS and the Government put the Government on notice that allegedly improper Scheme 1 conduct was occurring at OMC.

Finally, Relators argue that the Administrative Order nullifies the Public Disclosure Bar with respect to the Post-July 31, 2009 OMC Claims. They are incorrect. As noted earlier, the Administrative Order prevented the Public Disclosure Bar from operating with respect to the claims in the original Complaint. Relators settled the original Complaint's Scheme 1 claims against AHS based on conduct at OMC. The FAC asserts new Scheme 1 claims against AHS based on conduct at OMC for a new time period. The Administrative Order does not impact those new claims.

> iii. Scheme 1 Claims Against the non-AHS Defendants Based on Post-July 31, 2009 Conduct at OMC & Scheme 1 and Certain Scheme 3 Claims Against the non-AHS Defendants Based on Conduct at MMC

For the reasons stated by AHS, the non-AHS Defendants maintain that the Court lacks jurisdiction over Scheme 1 and certain Scheme 3 claims based on conduct at MMC, and that it also lacks jurisdiction over Scheme 1 claims based on post-July 31, 2009 conduct at OMC. The non-AHS Defendants are correct.

The RAC has been auditing OMC and MMC to identify improper inpatient admissions. Scheme 1 alleges that the non-AHS Defendants were responsible for some of those admissions. As relevant here, Scheme 3 alleges that the non-AHS Defendants failed to reimburse Medicare when they discovered that inpatient admissions were improper. Relators argue that the Public Disclosure Bar does not apply to the aforementioned Scheme 1 and Scheme 3 claims against the non-AHS Defendants because "[t]here is nothing in the record to suggest that the audits and/or any reports emanating therefrom refer or relate to any of the non-AHS defendants," Relator's Br. at 11, n.10. But that is not the standard. For the Public Disclosure Bar to apply against the non-AHS Defendants, Relators' allegations against the non-AHS Defendants must be similar to the activity being investigated by the RAC audits. It is not the case that "for there to be [a] public disclosure, the specific defendants named in the lawsuit must have been identified in the public records" that are the subject of the Public Disclosure Bar.

*U.S. ex rel. Gear v. Emergency Med. Assocs. of Ill., Inc.*, 436 F.3d 726, 729 (7th Cir. 2006). Regardless, it appears that to the degree RAC audits identify improper inpatient admissions at OMC and MMC, RAC audits will also identify improper admissions made by the non-AHS Defendants at OMC and MMC. *See* SMG's Reply at 7-11 (citing CMS, September 1, 2011 Statement of Work for the Recovery Audit Program, at 8).

Ultimately, Relators have not satisfied their burden to establish that the Public Disclosure Bar does not apply, and that this Court has jurisdiction over Scheme 1 and certain Scheme 3 claims against the non-AHS Defendants based on conduct at MMC. Nor have Relators satisfied their burden to establish this Court's jurisdiction over Scheme 1 claims against the non-AHS Defendants based on post July 31, 2009 conduct at OMC. Accordingly, the aforementioned claims will be **DISMISSED WITH PREJUDICE.**

> b.      Rule 9(b) and Rule 12(b)(6) Motions to Dismiss

Defendants argue that Counts I and II should be dismissed under Rule 9(b), which applies to FCA claims. *See United States ex rel. Schmidt v. Zimmer, Inc.*, 386 F.3d 235, 242 n.9 (3d Cir. 2004). Defendants also argue that Counts I and II should be dismissed under Rule 12(b)(6) based on a failure to state a claim upon which relief can be granted.

> i.      The FCA

Count I is a claim for the submission of false and fraudulent claims under 31 U.S.C. § 3729(a)(1). "To establish a prima facie case under the False Claims Act a plaintiff must prove: (1) the defendant presented or caused to be presented to an agent of the United States a claim for payment; (2) the claim was false or fraudulent; and (3) the defendant knew the claim was false or fraudulent." *Hutchins v. Wilentz, Goldman & Spitzer*, 253 F.3d 176, 182 (3d Cir. 2001).

Count II is a claim for making, using, and causing to be made and used false records and statements under 31 U.S.C. § 3729(a)(2). "To state a claim under 31 U.S.C. § 3729(a)(2), a plaintiff must allege (1) the defendant made, used, or caused to be made or used, a record or statement to get a claim against the United States paid or approved; (2) the record or statement and the claim were false or fraudulent; (3) the defendant knew that the record or statement and the claim were false or fraudulent; and (4) the United States suffered damages as a result." *U.S. v. Merck-Medco Managed Care, L.L.C.*, 336 F. Supp. 2d 430, 438 (E.D. Pa. 2004). "For the purposes of the FCA, 'knowing' can mean either 'actual knowledge of the information,' 'deliberate ignorance of the truth or falsity of the information,' or 'reckless disregard of the truth or falsity of the information.'" *Landau v. Lucasti*, 680 F. Supp. 2d 659, 665 (D.N.J. 2010) (citing 31 U.S.C. § 3729(b)(1)).

To state a claim under Count I or Count II, Plaintiffs do not have to identify specific false claims. *See United States ex rel. Wilkins v. United Health Group, Inc.*, 659 F.3d 295, 308 (3d Cir. 2011) ("[T]o our knowledge we never have held that a plaintiff

must identify a specific claim for payment at the pleading stage of the case to state a claim for relief.").

ii.      FCA Claims Against the Non-AHS Defendants

1.      Scheme 1

Scheme 1 alleges that the non-AHS Defendants billed Medicare for inpatient services when they knew that inpatient services were not medically necessary. Scheme 1 implicates conduct at OMC, MMC, and Mountainside. The Court has already dismissed, on jurisdictional grounds, Scheme 1 and certain Scheme 3 claims against the non-AHS Defendants based on conduct at MMC, and it has also dismissed Scheme 1 claims against the non-AHS Defendants based on post-July 31, 2009 conduct at OMC. Accordingly, the Court need only address Scheme 1 conduct (a) at Mountainside, and (b) at OMC (prior to August 1, 2009).

As Relators say basically nothing about conduct at Mountainside, the Court will **DISMISS WITHOUT PREJUDICE** Relators' Scheme 1 allegations against the non-AHS Defendants based on conduct at Mountainside.

The Court will also **DISMISS WITHOUT PREJUDICE** Relators' Scheme 1 allegations against the non-AHS Defendants based on pre-August 1, 2009 conduct at OMC. Some of Relators' allegations are conclusory statements that the non-AHS Defendants billed for inpatient admissions that were not medically necessary. Other allegations state that the non-AHS Defendants refused to follow certain guidelines. But Relators appear to concede AHS's argument that these guidelines do not have the force of law and cannot, by themselves, support an FCA claim. Moreover, just because the non-AHS Defendants were allegedly resistant to certain guidelines, it does not follow that they billed for care that was neither reasonable nor medically necessary. Finally, just because OMC concluded that Dr. Schreck and Dr. Patel had, on certain occasions, incorrectly billed Medicare for inpatient care, it does not follow that either doctor acted knowingly (assuming that OMC was right to recharacterize their status choices).

2.      Scheme 2 and Scheme 3

Scheme 2 alleges that the non-AHS Defendants billed Medicare for outpatient "observation services" or "treatment room services" for patients who did not meet medical necessity criteria for such care. FAC ¶ 3(b). Scheme 3 alleges that the non-AHS Defendants failed to correct claims for improper inpatient admissions and improper observation admissions. *Id.* ¶ 3(c). The Court finds that Relators have not plausibly alleged an FCA violation against the non-AHS Defendants based on Scheme 2 conduct at OMC or Mountainside. As for Scheme 3 conduct at MMC, the Court has already dismissed, on jurisdictional grounds, allegations concerning improper inpatient billing. On merits grounds, the Court will now dismiss the additional Scheme 3 allegations pertaining to observation admissions because they are not supported by well-pled facts.

Relators appear to agree with these dismissals, as their proposed Second Amended Complaint omits any mention of Scheme 2 or Scheme 3. Accordingly, the Court will **DISMISS WITHOUT PREJUDICE** Counts I and II against the non-AHS Defendants to the extent Counts I and II are based on Scheme 2 conduct at OMC, MMC, and Mountainside. The Court will also **DISMISS WITHOUT PREJUDICE** Counts I and II against the non-AHS Defendants to the extent Counts I and II are based on Scheme 3 conduct at OMC, MMC (observation billing claims only), and Mountainside.

### 3.     Scheme 4

It is unclear whether Scheme 4 is directed at the non-AHS Defendants. Scheme 4 alleges that AHS (and perhaps the non-AHS Defendants) failed to inform physicians and patients when OMC changed a patient's status from inpatient to outpatient. It also alleges that MMC and Mountainside either failed to correct improper inpatient statuses, or that they made such corrections "inadequate[ly]." The non-AHS Defendants committed an FCA violation if they submitted false bills to Medicare. They did not violate the FCA by failing to tell people that OMC had determined that certain patients were mischaracterized as inpatients. Furthermore, the non-AHS Defendants are not responsible for MMC and Mountainside's inadequate efforts to correct improper patient statuses. Accordingly, the Court will **DISMISS WITH PREJUDICE** Counts I and II against the non-AHS Defendants to the extent Counts I and II are based on Scheme 4.

### 4.     Scheme 5 and Scheme 6

Scheme 5 alleges that the non-AHS Defendants kept patients on the inpatient service even after inpatient care was no longer medically necessary. *Id.* ¶ 3(e). Scheme 6 is a subset of Scheme 5. Scheme 6 alleges that the non-AHS Defendants kept certain inpatients in the hospital for three days just so Medicare would pay for the patients' post-hospital care services at skilled nursing facilities, or "SNFs." As Scheme 5 incorporates Scheme 6, the Court will interpret Scheme 5 to exclude conduct covered by Scheme 6.

The FAC says nothing about any involvement that non-AHS Defendants Dr. Patel, HA, EMA, or SMG allegedly had in Scheme 5 or Scheme 6. Accordingly, the Court will **DISMISS WITH PREJUDICE** Counts I and II against Dr. Patel, HA, EMA, or SMG to the extent Counts I and II are based on Scheme 5 and 6 conduct at OMC, MMC, and Mountainside.

With respect to Dr. Schreck's conduct at OMC, the FAC does not plead a Scheme 5 violation by Dr. Schreck, but it does plead a Scheme 6 violation by Dr. Schreck. According to the FAC, Dr. Schreck ordered an unnecessary IV antibiotic even though infection had not been ruled in, just so that Dr. Schreck could keep the patient in the hospital for the three days necessary for Medicare to pay an SNF. *Id.* ¶ 163. Relators state that Dr. Schreck took these steps "solely to meet the financial needs of the patient's family who were looking from the outset . . . for long term care placement. *Id.* These allegations, which the Court assumes to be true for purposes of the motion to dismiss,

plausibly allege a Scheme 6 violation, and they do so with the particularity required by Rule 9(b). While Dr. Schreck argues that the inpatient admission was medically necessary, this argument is better dealt with on summary judgment than on a motion to dismiss. The FAC does not discuss Dr. Schreck's activities at MMC or Mountainside. Accordingly, the Court will **DISMISS WITHOUT PREJUDICE** Counts I and II against Dr. Schreck to the extent Counts I and II are based on Scheme 5 conduct at OMC, MMC, and Mountainside, and to the extent Counts I and II are based on Scheme 6 conduct at MMC and Mountainside. To the extent Counts I and II against Dr. Schreck are based on Scheme 6 conduct at OMC, Counts I and II survive.

### iii.     FCA Claims Against AHS

As AHS makes separate arguments for why Counts I and II should be dismissed with respect to conduct at OMC, MMC, and Mountainside, the following sections consider each hospital individually.

### 1.     OMC

Scheme 1 alleges that AHS billed for inpatient care at OMC that was not medically necessary. Scheme 1 allegations against OMC have either been settled or dismissed for lack of jurisdiction. Turning to the merits, the Court finds that the FAC does not plausibly allege an FCA violation by OMC based on Schemes 2-6.

Scheme 2 alleges that the AHS billed Medicare for outpatient "observation services" or "treatment room services" for patients who did not meet medical necessity criteria for such care, while Scheme 3 alleges that AHS failed to correct claims for improper inpatient and observation admissions. *Id.* ¶¶ 3(b), (c). But the FAC does not provide allegations making either scheme plausible. (As noted earlier, Relators omit Scheme 2 and Scheme 3 from their proposed Second Amended Complaint).

Next, Scheme 4 alleges "upon information and belief" that doctors billed Medicare for inpatient admissions at OMC even after OMC reclassified the inpatient admissions as outpatient admissions. Scheme 4 fails to state an FCA claim against AHS because AHS's inaction at OMC did not cause doctors to submit false bills. As AHS rightly notes, "[i]f the physicians' claims are 'false,' then they would have been false regardless of whether or not [OMC] corrected its own claims." AHS's Br. at 24, ECF No. 52. *See also Zimmer*, 386 F.3d at 245 ("[M]ere awareness that another may, or even has, chosen to make such a claim does not alone constitute causing a false claim to be presented.") (internal quotation and citation omitted).

Next, Scheme 5 alleges that OMC billed Medicare for unnecessary services for patients admitted as inpatients. Scheme 6 alleges that OMC knowingly and improperly kept certain inpatients in the hospital for three days so that the patients would qualify for post-hospital care services paid for by Medicare. As Scheme 5 incorporates Scheme 6, the Court will interpret Scheme 5 to exclude conduct covered by Scheme 6. The Court finds that Relators have not pled a plausible Scheme 5 claim. Roughly one half of the

examples of "improper admissions" contained in the FAC reflect that OMC changed billing codes when it discovered improper inpatient admissions. While the FAC describes two instances of tests that were allegedly unnecessary, *see* FAC ¶ 163, 166, both were allegedly performed in order to justify a three day admission so that a patient would qualify for SNF care. Accordingly, those allegations are better considered under Scheme 6.

The Court finds that Relators have not plausibly stated a Scheme 6 claim against AHS based on conduct at OMC. Relators allege several instances in which doctors allegedly tried to keep patients on the inpatient service for three days in the absence of medical necessity, just so Medicare would cover SNF care for these patients. FAC ¶ 163-64, 166. In each case, OMC personnel attempted to persuade the physician that the inpatient admission was not medically necessary. It is not plausible that OMC was knowingly causing improper SNF admissions when it was directing its physicians to take patients off the inpatient service before the three days were up.

In sum, the Court has jurisdiction over, Counts I and II against AHS to the extent those counts allege conduct at OMC described in Schemes 2-6. With respect to Scheme 4 conduct at OMC, the Court will **DISMISS** Counts I and II against AHS **WITH PREJUDICE**. With respect to conduct at OMC based on Schemes 2-3 and 5-6, the Court will **DISMISS** Counts I and II against AHS **WITHOUT PREJUDICE**.

### 2. MMC

The Court has already dismissed the Scheme 1 claims and certain Scheme 3 claims against AHS based on conduct at MMC on jurisdictional grounds. With respect to the merits, the FAC does not plausibly allege an FCA violation by AHS at MMC based on Schemes 2, 3 (observation claims only), or 5-6, nor does it allege such violations with the particularity required by Rule 9(b). Furthermore, as noted earlier, Scheme 4 fails to state a claim upon which relief can be granted. Accordingly, to the extent Counts I and II are based on Scheme 4 at MMC, the Court will **DISMISS** Counts I and II against AHS **WITH PREJUDICE**. Accordingly, to the extent Counts I and II are based on Schemes 2, 3 (observation claims only), or 5-6 at MMC, the Court will **DISMISS** Counts I and II against AHS **WITHOUT PREJUDICE**.

### 3. Mountainside

As for Mountainside, the FAC says almost nothing. The few passing references to Mountainside do not plausibly state an FCA claim under Scheme 1-3 and 5-6, and they certainly do not do so with the particularity required by Rule 9(b). Furthermore, Scheme 4 does not state a claim under the FCA. Accordingly, to the extent Counts I and II are based on Scheme 4 at Mountainside, the Court will **DISMISS** Counts I and II against AHS **WITH PREJUDICE**. Accordingly, to the extent Counts I and II are based on Schemes 1-3 and 5-6 at Mountainside, the Court will **DISMISS** Counts I and II against AHS **WITHOUT PREJUDICE**.

### 2. Counts III and IV

Count III is a claim for conspiracy under the FCA, and Count IV is a claim for wrongful retention under the FCA. Plaintiffs intend to voluntarily dismiss these claims without prejudice. Relators' Br. at 30. Accordingly, Relators' proposed Second Amended Complaint SAC does not contain FCA claims for conspiracy or wrongful retention. Since Relators are abandoning these claims, the Court will dismiss Counts III and IV **WITH PREJUDICE**.

### 3. Counts V-VIII

In Counts V-VIII (the "Retaliation Claims"), Tahlor and Marino assert retaliation claims under CEPA and the FCA. Defendants maintain that Counts V-VIII are untimely. Relators had one year from their 2008 termination to bring retaliation claims under CEPA, *see* N.J.S.A. § 34:19-5, and they had at most three years from their 2008 termination to bring a retaliation claim under the FCA, *see* 31 U.S.C. § 3730(h)(3). Because Relators filed the retaliation claims in 2012, the retaliation claims are untimely unless the Administrative Order tolled the limitations period. The Administrative Order did not toll the limitations period.

As an initial matter, filing the original sealed qui tam complaint did not toll any statutes of limitation. *United States ex rel. Deering v. Physiotherapy Assocs., Inc.*, 601 F. Supp. 2d 368, 373-74 (D. Mass. 2009). Similarly, the Administrative Order did not toll statutes of limitation for claims that had not accrued when the Administrative Order was signed on May 19, 2008. By its own terms, the Administrative Order stayed this action and further provided that if the action were to be reopened, Relators' rights would be "fully preserved **as they exist at the time of entry of [the Administrative Order]**." Administrative Order at 2 (emphasis added). This included Relators' rights under the Public Disclosure Bar and the FCA's statute of limitations. *Id.*

The alleged retaliation in this case occurred in the Summer of 2008, after the Administrative Order was signed. Since the Administrative Order did not preserve rights that did not exist at the time it was signed, and since Relators had no right to bring retaliation claims when the Administrative Order was signed, the Administrative Order could not have affected Relators' retaliation claims.

This case is similar to *Walsh Securities, Inc. v. Cristo Property Management, Ltd.*, No. 97-3496, 2006 WL 166491, at **1-7 (D.N.J. Jan. 23, 2006). The *Walsh Securities* court administratively terminated a complaint. Some years later, after the administrative termination had been lifted, plaintiff moved to assert claims against an additional defendant. Those claims were untimely. Plaintiff argued that the administrative termination tolled the limitations period. The *Walsh Securities* court rejected this argument, holding that: "[n]othing prevented [the plaintiff] from moving to return the case to the active docket for the limited purpose of asserting a claim against a non-party in order to prevent the statute [of limitation] from running." *Id.* at *6. Here, the Administrative Order allowed Relators to administratively reopen the case and file a

motion "at any time, for any reason, on written notice to the Court." Administrative Order at 2. Relators chose not to take advantage of that opportunity. Accordingly, the Court will **DISMISS** Counts V-VIII **WITH PREJUDICE**.

### B. Relators' Motion To Amend

Relators' move to file a Second Amended Complaint ("SAC"). As the proposed SAC includes claims over which the Court lacks jurisdiction, and as the proposed SAC also includes claims that the Court is dismissing with prejudice, the Court cannot allow the proposed SAC to become the operative pleading in this case. Accordingly, the Court will **DENY** the motion to amend. However, because the proposed SAC corrects a single deficiency in the FAC, and because it is conceivable that Relators can cure other deficiencies in the FAC, the Court will grant Relators 30 days in which to file an amended pleading. In the next section, the Court explains why the proposed SAC corrects a deficiency in the FAC.

#### 1. Scheme 1 Claims Against the Non-AHS Defendants Based on pre-August 1, 2009 Conduct at OMC

The Court finds that the proposed SAC's Scheme 1 allegations against the non-AHS Defendants based on pre-August 1, 2009 conduct at OMC satisfy Rule 8(a) and Rule 9(b). Scheme 1 alleges that the non-AHS Defendants billed Medicare for inpatient admissions when the admissions were not medically necessary. In support of this claim, the proposed SAC alleges that the non-AHS Defendants would admit patients to the inpatient service, apparently at OMC, (and bill accordingly) without even considering whether observation services were appropriate. *See, e.g.,* SAC ¶¶ 178 (Dr. Schreck said he had a "'right' to admit patients as he saw fit and without regard to any objective criteria as to medical necessity"); 186 (SMG physicians "resisted and refused" to use the observation level of care); 213 (an EMA doctor told Marino: "I was told not to write observations."); 216 (HA doctors "outright refused" to admit patients to observation care); 217 (Dr. Patel told Marino that he "simply would not admit patients to observation). These allegations satisfy Rule 9(b)'s requirement that a pleading "inject[] precision and some measure of substantiation into . . . allegations of fraud." *Lum v. Bank of Am.*, 361 F.3d at 224. Furthermore, if the proposed SAC's allegations about blanket refusals to place patients on observation status are true, it is plausible that the non-AHS Defendants billed Medicare for inpatient care that was not medically necessary. And it is at least plausible that the non-AHS Defendants acted with recklessness, and possibly with knowledge. *See Landau v. Lucasti*, 680 F. Supp. 2d at 665 (FCA liability requires knowledge or recklessness).

Defendants' strongest argument to the contrary come from SMG. SMG notes that "whether a claim is valid depends on the contract, regulation, or statute that supposedly warrants it. It is only those claims for money or property to which a defendant is not entitled that are 'false' for purposes of the False Claims Act." SMG's Br. at 19, ECF No.

56 (quoting *United States v. Southland Mgmt. Corp.*, 326 F.3d 669, 674-75 (5th Cir. 2003)). But SMG acknowledges that claims can be false if they bill for care that was not "reasonable and medically necessary" or that was "provided in excess of the needs of the patient." SMG's Br. at 22 (citing 42 U.S.C. § 1395y(a)(I)(A), 42 U.S.C. § 1320c(a)(1), and 42 U.S.C. § 1320a-7(b)(6)&(8)). That is precisely what Plaintiffs are alleging: that Defendants billed for inpatient care that was not medically necessary and was provided in excess of the needs of patients who required only observation care.

SMG also argues that as a matter of law, a bill for inpatient services cannot be a false claim under the FCA. As an initial matter, at least one other court has rejected this argument. *See U.S. ex rel. Tucker v. Christus Health*, No. 9-1819, 2012 WL 5351212, at \*\*2-5 (S.D. Tex. 2012) (plaintiffs stated a claim under the FCA where they alleged that doctors billed Medicare for inpatient care that was not medically necessary). SMG argues: "It is well established that the admission status determination of a patient is 'a complex medical judgment' and physicians *may* disagree whether a patient is properly admitted as inpatient versus outpatient, or otherwise." SMG Br.'s at 23. But just because reasonable minds can disagree about cases that fall within a grey area, it does not follow that reasonable minds will disagree about all cases. If a doctor admitted an otherwise healthy patient to the inpatient service just because the patient had a paper cut, and if the doctor proceeded to bill Medicare for an inpatient admission, the doctor would violate the FCA.

## IV. CONCLUSION

For the reasons set forth above, the Court rules as follows:

Rule 12(b)(1) Motions

Defendants' Rule 12(b)(1) motions to dismiss are **GRANTED**. Scheme 1 and Scheme 3 claims (inpatient claims only) based on conduct at MMC, and Scheme 1 claims based on post-July 31, 2009 conduct at OMC are **DISMISSED WITH PREJUDICE** against all Defendants.

Rule 9(b) and 12(b)(6) Motions

- *Counts I and II*
  Defendants' Rule 12(b)(6) motions to dismiss Counts I and II are **GRANTED IN PART**, and **DENIED IN PART**.
  *With respect to AHS*: Counts I and II are **DISMISSED WITH PREJUDICE** to the extent they are based on Scheme 4 conduct at OMC, MMC, and Mountainside. Counts I and II are **DISMISSED WITHOUT PREJUDICE** to the extent they are based on conduct at OMC described in Schemes 2, 3, 5, and 6, to the extent they are based on conduct at MMC described in Schemes 2, 3 (observation claims only), 5, and 6, and to the extent they are based on conduct at Mountainside described in Schemes 1-3 and 5-6.

*With respect to Dr. Patel, EMA, SMG, and HA*: Counts I and II are **DISMISSED WITH PREJUDICE** with respect to Scheme 4 conduct at OMC, MMC, and Mountainside. Counts I and II are **DISMISSED WITHOUT PREJUDICE** to the extent they are based on conduct at OMC described in Schemes 1 (pre-August 1, 2009 conduct only), 2, 3, 5, and 6, to the extent they are based on conduct at MMC described in Schemes 2, 3 (observation claims only), 5, and 6, and to the extent they are based on conduct at Mountainside described in Schemes 1-3 and 5-6.

*With respect to Dr. Schreck*: Counts I and II are **DISMISSED WITH PREJUDICE** with respect to Scheme 4 conduct at OMC, MMC, and Mountainside. Counts I and II are **DISMISSED WITHOUT PREJUDICE** to the extent they are based on conduct at OMC described in Schemes 1 (pre-August 1, 2009 conduct only), 2, 3, 5, and 6, to the extent they are based on conduct at MMC described in Schemes 2, 3 (observation claims only), 5, and to the extent they are based on conduct at Mountainside described in Schemes 1-3 and 5-6. Scheme 6 claims against Dr. Schreck based on conduct at OMC survive.

- *Counts III-IV*

    Defendants' Rule 12(b)(6) motions to dismiss Counts III-IV is **GRANTED**. Counts III-IV are **DISMISSED WITH PREJUDICE**.

- *Counts V-VIII*

    AHS's Rule 12(b)(6) motion to dismiss Counts V-VIII is **GRANTED**. Counts V-VIII are **DISMISSED WITH PREJUDICE**.

Relators' Rule 15(a) Motion to Amend

    Relators' Rule 15(a) motion to amend is **DENIED.**

    The Court will grant Relators 30 days in which to amend their pleading to address only those deficiencies identified herein. An appropriate order follows.


                                    /s/ William J. Martini
                                 **WILLIAM J. MARTINI, U.S.D.J.**

**Date: October 31, 2013**